UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 07-0035 (RWR) |
| v. : | |
| SUSAN L. JACKSON, : | |
| Defendant : | |
| _____: | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing decision. Consistent with the plea agreement in this case, and the recommendation of the United States Sentencing Commission, the Government requests that this Court sentence the defendant to a prison term at the high end of Offense Level 11.[1]

This is an employee embezzlement case, involving a small not-for-profit company named "Pundit Productions, Inc." The defendant's title was "Operations and Financial Manager," which gave her day-to-day bookkeeping and management responsibility for the company's finances. Unknown to her employer, Melinda Wittstock, the defendant helped herself to the company's money and squandered it away on leisure-time activities.

---

[1] According to the Presentence Report (PSR), the defendant falls within Criminal History Category I, based on one prior misdemeanor conviction. The recommended sentencing range, therefore, is 8 to 14 months incarceration.

-2-

### A. Procedural History

On March 2, 2007, defendant Susan Jackson pleaded guilty to Count I of a 23-count Indictment charging wire fraud (transfers of funds from her employer's business account to three of the defendant's personal accounts); access device fraud (unauthorized use of her employer's credit cards); and first degree theft (cashing a $1,120.85 check). In return for the defendant's guilty plea to Count I and her admission that she committed the conduct supporting all of the charges, the Government has agreed to dismiss the remaining counts at sentencing. The defendant long ago admitted to her employer that she took the money, but she has made no attempt at restitution.

### B. Sentencing Guidelines

The Government believes that a guidelines sentence of 14 months is reasonable and appropriate.[2] The United States Sentencing Guidelines ("USSG") recommends a sentence as follows:

- The base level offense for violation of a 20-year maximum fraud statute is 7 (§2B1.1(a)(1));

- 6 levels are added for loss greater than $30,000 but less than $70,000 (§2B1.1(b)(1)(D));

- 2 levels subtracted for acceptance of responsibility (§3E1.1(b));

---

[2] Title 18 U.S.C. § 1343 carries a maximum sentence of 20 years in prison, a fine of $250,000, a $100 special assessment, a 3-year term of supervised release, an order of restitution, and an obligation to pay any applicable interest or penalty on fines or restitution not timely made.

-3-

- **Total adjusted offense level: 11**.

With a criminal history of Category I, the range of punishment under the USSG is **8 to 14 months** in prison. For the reasons set forth below, the Government believes that a sentence in the high end of this range is reasonable and appropriate. It is our view that the defendant cannot demonstrate that her conduct or personal history suggest any appropriate reason or extraordinary circumstance justifying a low-end or a non-guidelines sentence.

### C.   Factual Background

For nearly the entire term of her employment (a period of a year and a half, from November 2004 until April 2006), the defendant engaged in a consistent pattern of fraud and theft from her employer, Pundit Productions, Inc. She was tasked with clerical and bookkeeping responsibilities, including bill payment and bank account reconciliation, for which she was paid an annual salary of $32,445. Rather than honestly fulfilling her duties, the defendant used her employer as a piggy-bank, taking more and more money as time went on, to support and improve her personal lifestyle. She was entrusted with complete access to the company's bank accounts and payment systems, which trust she abused by setting up a system that purported to transfer Pundit funds to its payroll contractor, while in reality it deposited funds directly into three of the defendant's personal bank

-4-

accounts any time she needed cash.[3]

This case is not about one impulsive act or a crime of opportunity; rather, this crime was carefully constructed, and then continually implemented time after time after time. On twenty-one (21) separate occasions from March 1 to November 16, 2005, the defendant directed Pundit's bank to make wire transfers to her personal accounts (at Wachovia, the Georgetown Alumni Federal Credit Union, and the NASA Federal Credit Union), sometimes multiple times a day.

Nor is this case about an individual struggling with poverty and lack of opportunity. The transfers ranged from $200 to $6,000 a day (amounting to a grand total of $41,109). The money was used to establish a lifestyle of ease, buying clothes, electronics, restaurant meals, cellular telephones and service,

---

[3] As many consumers of online banking services are aware, the program set-up directs the banking customer to establish a list of monthly creditors. The consumer sets up a payment, *e.g.*, to "PEPCO," and then types the PEPCO bank account number to which his payment is to be wire transferred. After each account is established in this way, the consumer merely types in his payment amount each month, and the bank has its instructions for routing the payment. At the end of each month, the customer's monthly statement reflects the payment to "PEPCO."

In this case, the defendant set up three different accounts for the company's payroll contractor, "ADP." One of the three accounts the defendant established had the real account number of ADP; however, the other two *said* "ADP" but specified transferee account numbers of *the defendant's* bank accounts. When Pundit received it's bank statement each month, the wire transfers all reflected funds transferring to "ADP."

-5-

limousine services, and leisure travel.[4]

At the same time the defendant was using the wire transfer scheme, she was also helping herself to the company's credit cards and checking account. Spreading her expenses in this fashion further concealed her activities. For example, the defendant used Pundit's debit account to purchase a cellular telephone, and she used the Capital One credit account to buy internet service. The internet service was charged month after month, even after the defendant stopped showing up for work -- indeed, after many of the methods of her thievery had been discovered and fully *three months* after she told Ms. Wittstock in an email that she was "ashamed and remorseful" for stealing her money. She was not sufficiently ashamed nor remorseful to alert

---

[4] Well over half of the total money the defendant stole was taken during a two-month time period from late April to late June of 2005. During just this short time period, the defendant went on shopping sprees; withdrew well over $11,000 in cash; spent over $2,500 in restaurants and coffee shops; and took lavish trips with her husband to Las Vegas and Boston for which she bought formal clothes and limousine services and charged plane tickets to Pundit's debit *and* credit cards.

On a typical day, the defendant spent enormous sums of money in restaurants, retail stores and beauty salons. For example, on May 2, 2005, the defendant charged clothing and merchandise totaling $867.72 (including $559.24 at Best Buy); paid three restaurant bills totaling $230.09; made a cash withdrawal of $100, filled two cars with gasoline, and paid a $217.65 electric bill, all apparently financed by a $4,000 wire transfer from her employer's account, three days before.

Two weeks later the defendant and her husband flew to Las Vegas, a trip for which she withdrew a total of $2,700 in cash, funded by two additional wire transfers from Pundit's accounts.

-6-

Ms. Wittstock to cut off the internet service,[5] or to begin paying back all of the money she stole.

And finally, in addition to the wire transfers, the lavish trips, and the fraudulent credit card charges spread across Pundit's accounts, on March 9, 2005, the defendant wrote to herself a check for $1,120.85. She then had the audacity to lie about the check, claiming falsely that she had used the money to buy television equipment for the company, knowing all along that she used other Pundit funds for that purpose. Similarly, the defendant charged various accounts of internet service to different credit cards, confusing what service was really authorized and concealing the existence of unauthorized service.

Ultimately, it was not the discovery of the theft that led to the defendant's termination; rather, she simply stopped showing up for work and would not respond to the company's calls inquiring of her whereabouts. After avoiding all of the company's efforts to contact her, the defendant sent to Ms. Wittstock an email, in which she stated:

> I am truly ashamed and remorseful for what happened. There are no words to express to you the things that have been going on in my life to drive me to do something of this

---

[5] The defendant's counsel recently advised the government that the defendant now believes that she mistakenly admitted to wrongdoing with respect to the internet service. It is now her position that these charges were authorized. The victim has been advised of the defendant's recent denial, and maintains her position that the service was unauthorized.

-7-

> nature.  I have an addiction that I needed to
> fund, as well as, the medical bills, etc.  I
> have seeked *[sic]* help and counseling to deal
> with my problem and suicide, that I truly was
> not aware even existed until recently.  I
> have never in my life sent myself on such a
> destructive path, not thinking.

*Email* from "Sjackson021@aol.com" dated January 20, 2006 (the account registered to Susan Jackson at her home address).  When Ms. Jackson finally spoke directly to Ms. Wittstock, she claimed that she took the money because she had cancer.  Ms. Wittstock begged the defendant to repay any amount of money she could, because the company was at the brink of bankruptcy and by then in danger of losing its source of funding because the Inspector General of the Corporation for Public Broadcasting had initiated an investigation of the loss of funds it had provided.  Although the defendant promised repayment, she never made even the smallest payment.

When interviewed by the Secret Service two months later, the defendant said nothing of cancer (other than a vague reference to medical bills); rather, she admitted she used the money for personal expenses:

> I currently have a husband and three children
> to provide for and the money was used solely
> for the purpose to maintain my household and
> bills.  We own no property or stock and have
> been struggling check by check to get out of
> debt and maintain monthly bills, including an
> increase of medical bills.

Defendant's Statement dated March 22, 2006, at page 2.  Even this

-8-

statement was misleading, since the defendant's expenditures reflect no medical bills other than insignificant pharmacy charges, and the PSR reflects no current illness or history of illness.  *See* PSR at ¶44.

### D.   Sentencing Factors under 18 U.S.C. §3553

As the Court is well-aware, the recommended sentence set forth in the USSG is but one factor to consider in determining an appropriate sentence.  *See* 18 U.S.C. §3553(a).  But as set forth below, the §3553 considerations the Court should consider do not provide a basis in this case, for a sentence other than that recommended by the Sentencing Commission.

First, it is clear from the explicit language of §3553 that the framers both endorsed and respected the ranges set by and the policy statements made by the United States Sentencing Commission, which in these circumstances recommends imprisonment. Second, we note that the converse is also true, that is, that the USSG explicitly recognizes §3553 as its lynchpin of its framework, setting forth in its preamble its reliance on the statute and calling out each and every factor set forth therein. We note most particularly the factor set forth in §3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," which is the heart and spirit of the Guidelines.  *See* 18 U.S.C. §3553(a)(6).  It is with this

-9-

commitment that the government presses the Court for a sentence consistent with the Guidelines.

Looking to the factors of §3553, we first contend that a sentence within the range of 8 to 14 months is appropriate to the "nature and circumstances of the offense and the history and characteristics of the defendant" (*see* §3553(a)(1)). The many schemes of this defendant were carefully crafted, intentionally diversified, and carried out over a long period of time, accelerating as time went by and she succeeded without detection. The defendant victimized a small non-profit company, whose leaders had placed enormous trust in her, had given her the opportunity of interesting employment, and valued her friendship. In response, the defendant looted the company for petty, foolish, excessive comforts. Her history and characteristics reflect an individual with employable skills and a salary more than sufficient to support her family. She has a husband who assists her with the needs and expenses of their household. She suggested that she would repay the money she rapaciously stole, but never did. Only a sentence of imprisonment is sufficient to "reflect the seriousness of the offense ... promote respect for the law, and ... provide just punishment" (*see* §3553(a)(2)(A)), and at the same time "afford adequate deterrence to [future] criminal conduct" (*see* §3553(a)(2)(B)). Deterrence and respect for the law are both lacking where the sole punishment for

-10-

stealing -- only if it is detected -- is disgorgement of the profit; particularly where, as here, the defendant squandered the money away.

Significantly, §3553 places fundamental emphasis on uniformity of sentencing, which adherence to the guidelines provides. A "Zone C" sentence in the range of 8 to 14 months, consistent with similar crimes and the defendants committing them, is appropriate. The defendant can articulate no compelling fact or circumstance that justifies a sentence lower than similarly situated offenders. Indeed, the defendant is *not* necessarily similarly situated with most offenders falling within Criminal History I, because that category also accounts for first-time offenders with *no* criminal history and this defendant has a prior conviction. This prior conviction is not minor, since it reflects the defendant's disrespect for the court that had commanded her presence; moreover, the conviction should have served as a "wake-up call" that would have encouraged the defendant to lead a law-abiding life. It didn't. And it suggests that the defendant is not entitled (as a first-time offender might be) to a low-end sentence.

The defendant used a company that paid her and treated her well as her personal piggy-bank so that she could dine lavishly, shop to her heart's content, travel in style, and ride in limousines. For this, she deserves punishment consistent with

-11-

simple adherence to the uniform Guidelines.  Certainly, no special consideration is due, that would suggest that she is entitled to a non-guidelines sentence.

## Conclusion

For the reasons set forth herein, the government believes that a sentence in the high-end of the range is necessary, reasonable and appropriate, and requests a sentence, pursuant to the U.S. Sentencing Guidelines, of **14 months'** imprisonment.

Respectfully Submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar Number 498610

By:            /s/

BARBARA E. KITTAY
D.C. Bar Number 414216
Assistant U.S. Attorney
555 Fourth Street, N.W., Rm. 4846
Washington, D.C.  20530
Tel. (202) 514-6940
Barbara.Kittay@usdoj.gov