### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Cr. No. 07-035 (RWR)** |
| | : | |
| **SUSAN L. JACKSON,** | : | |
| | : | |
| **Defendant** | : | |

### SENTENCING MEMORANDUM

On March 30, 2007, Ms. Jackson pled guilty to count one of the indictment charging her with Wire Fraud, in violation of 18 U.S.C. § 1343.  She will appear before this Honorable Court for sentencing on June 29, 2007.  Ms. Jackson, through undersigned counsel, respectfully submits the following information for the Court's consideration in determining a fair and just sentence.

### BACKGROUND

On February 13, 2007, a twenty three count indictment was filed charging Ms. Jackson with the following counts: Counts One through Twenty One - Wire Fraud, in violation of 18 U.S.C. § 1343; Count Twenty Two - Fraud in Connection with Access Devices, in violation of 18 U.S.C. § 1029(a)(5); and Count Twenty Three - First Degree Theft, in violation of 22 D.C. Code § 3211 and 3212(a).  On February 27, 2007, agents of the Secret Service appeared at the job location of Ms. Jackson, who was not there at the time, to inform her of the pending indictment and arrest warrant.  The agents left contact information for Ms. Jackson.  The following day, on February 28, 2007, Ms. Jackson contacted the Secret Service agents who had appeared at her job the day before to make arrangements to turn herself in to their custody.  On March 1, 2007, Ms. Jackson met with the Secret Service agents, as previously arranged.

Unfortunately, the routine processing of Ms. Jackson was not completed by the Magistrate

Court's "cut-off" time period of 1:30 p.m., and therefore Ms. Jackson was detained in the Central

Cellblock of the Metropolitan Police Department overnight.

On March 2, 2007, Ms. Jackson appeared before Magistrate Judge John M. Facciola for

her arraignment. After her arraignment, Ms. Jackson was then released on her personal

recognizance with the following conditions: report to the Pretrial Services Agency once a week

by phone and once a week in-person; live at the address provided to the Pretrial Services Agency;

stay within a 50 mile radius of the D.C. area; and to surrender her passport. To date, Ms. Jackson

has been in full compliance with all conditions of her pretrial release.

On March 30, 2007, Ms. Jackson appeared before this Court and pled guilty to Count One

of the indictment pursuant to a written plea agreement. Pursuant to the plea agreement, the

parties agreed that the applicable United States Sentencing Guidelines (hereinafter "guidelines")

are § 2B1.1(a), § 2B1.1(b)(1), and § 3E1.1. In sum, the parties agreed that the base offense level

is 7, with an additional 6 levels added due to the amount of loss in excess of $30,000, with a two

level reduction pursuant to Ms. Jackson's acceptance of responsibility; thereby resulting in a total

offense level of 11. It was further believed by the parties that Ms. Jackson had one prior

misdemeanor conviction which would result in one criminal history point, thereby placing Ms.

Jackson in the criminal history category I. Based upon those assessments, Ms. Jackson's

calculated guideline range would be 8 to 14 months within Zone C of the guidelines.

The Pre-Sentence Report (PSR) calculates the guideline range that was contemplated by

the parties pursuant to the plea agreement. Therefore, the PSR indicates that the applicable

sentencing guideline is a range of 8 to 14 months. See PSR, ¶ 70, pg. 13. Ms. Jackson does not

dispute to this calculation, however, she submits that the factors identified in 18 U.S.C. § 3553(a)

support her request that she be given a sentence below the applicable guideline range.

## **ARGUMENT**

Notwithstanding the agreements stated in the plea agreement, it should be noted,

however, that the Guidelines are not mandatory, but merely advisory.  The factors identified in

18 U.S.C. § 3553(a) support Ms. Jackson's request that she be sentenced below the applicable

guideline range.   The Court must consider the Guidelines, along with the other factors set forth

in 18 U.S.C. § 3553(a).  United States v. Booker, 543 U.S. 220, 260  (2005).  These factors

include:   "The nature and circumstances of the offense and the history and characteristics of the

defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct; and . . . the need to provide restitution to any victims of the offense."  18 U.S.C.

3553(a).  Pursuant to 18 U.S.C. § 3661,

> No limitation shall be placed on the information concerning the
> background, character, and conduct of a person convicted of an
> offense which a court of the United States may receive and
> consider for the purposes of imposing an appropriate sentence.

After considering all of the factors set forth in § 3553(a), the Court must impose a

sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s]

just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s]

the defendant with needed educational or vocational training and medical care."  Id. at 765

(citing 18 U.S.C. § 3553(a)(2)).  Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of
> imprisonment, and, if a term of imprisonment is to be imposed, in

> determining the length of the term, shall consider the factors set
> forth in Section 3553(a) to the extent that they are applicable,
> **recognizing that imprisonment is not an appropriate means of**
> **promoting correction and rehabilitation.**  (Emphasis added).

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]."  18 U.S.C. § 3553(a).

A review of all of the applicable factors set forth in § 3553(a) demonstrates that a sentence below the applicable guidelines would be warranted in this matter, and that a sentence of imprisonment within the Guideline range would be greater than necessary to meet the sentencing purposes set forth in § 3553(a)(2).

**I.     Factors of Ms. Jackson that the Court Should Consider under § 3553(a)(1)**

*I.     Nature of the Offense*

On July 1, 2004, Ms. Jackson began her employment with Pundit Productions Inc. (hereinafter "Pundit") as the company's Operations and Financial Manager.  This position required that Ms. Jackson work in the office from 9:30 a.m. to 1:30 p.m., Monday through Friday; with an additional five hours of working remotely.  Ms. Jackson's salary from this position was approximately $30,000.

Approximately eight months into her employment with Pundit, Ms. Jackson set up an on-line bill payment system to funnel unauthorized funds from Pundit's bank account into her own personal bank accounts.  Ms. Jackson also unlawfully used Pundit's credit card to transfer money to her personal bank account and to purchase plane tickets for herself and her husband to travel to Boston, Massachusetts, on June 17, 2005 (Father's Day weekend).  Further, Ms. Jackson unlawfully wrote out and cashed a check on Pundit's bank account.  The crime to which Ms.

4

Jackson pled guilty to is a very serious offense. The amount of loss to Pundit is over $40,000.

Ms. Jackson was terminated from this position on November 29, 2005, for failure to properly keep detailed financial records, incorrectly filing tax returns, and not appearing for work after exhausting all of her leave. As stated in her employee evaluation, during the first six months of Ms. Jackson's employment she was reliable and consistent with her work; however, since March 2005, Ms. Jackson's performance changed in light of several personal problems including the breakdown of her car, her phone not working, and a myriad of other family problems. It was in March 2005, that Ms. Jackson began to unlawfully take and divert funds from Pundit for her own personal gain.

On January 18, 2006, Melinda Wittstock emailed Ms. Jackson to inquire about a series of unexplained direct debits from March 2005 through October 2005. Later on that same day, Ms. Wittstock must have received information that these transactions were direct deposits into Ms. Jackson's personal accounts to which Ms. Wittstock sent another email to Ms. Jackson. In this second email, Ms. Wittstock informed Ms. Jackson that there was an urgent investigation into these unauthorized deposits. Further, Ms. Wittstock stated it would be in Ms. Jackson's best interest to immediately take steps to return all monies taken from the company and if not, she would press charges.

On January 20, 2006, Ms. Jackson responded to Ms. Wittstock's email of January 18, 2006, whereby Ms. Jackson admitted her wrongdoing and expressed feeling ashamed and remorseful for her conduct. Further, Ms. Jackson inquired about setting up a repayment plan. Shortly after this exchange of emails in February 2006, Ms. Jackson obtained the legal services of Jack Young to assist her in the repayment of funds to Pundit. According to Mr. Young, Pundit

Productions retained the legal services of Mark Smith.  On February 14, 2006, Mr. Young

contacted Mr. Smith to inquire about the possibility of garnishing all of Ms. Jackson's wages;

however Mr. Smith indicated that garnishment would not be acceptable and that immediate

repayment in full would be required.

On February 24, 2006, Ms. Jackson along with her attorney Mr. Young met at the law

offices of Mr. Smith in an effort to negotiate the repayment to Pundit.  Ms. Wittstock was also

present at this meeting.  During this meeting, there were discussions and settlement agreements

proposed involving a potential employer of Ms. Jackson named Kidd International (hereinafter

"Kidd").  The proposed agreement by Mr. Smith would require that if Ms. Jackson was employed

by Kidd, Kidd would guarantee payment.  In essence, Kidd would be civilly liable if no payments

were made.[1]   Unfortunately, Kidd did not want to be involved with a potential civil liability and

as a result did not decide to hire Ms. Jackson.  Once that decision was made, Mr. Smith indicated

that he would refer this matter to the United States Attorney's Office for the District of

Columbia.  On March 6, 2006, Mr. Young relayed this information to Ms. Jackson and advised

her to defer any repayment to Pundit until a criminal case was filed.[2]

On March 22, 2006, agents of the Secret Service came to Ms. Jackson's home to

interview her.  Ms. Jackson invited the agents inside her home and complied with all of their

requests.  The agents indicated that they wanted to obtain a statement from her about her

employment with Pundit.  After waiving her right to counsel, she gave a written statement to the

agents admitting her wrongdoing.  It was not until almost a year later that Ms. Jackson heard

---

[1]  The proposed agreement is attached as Exhibit 1.

[2]  A letter from Mr. Young is attached as Exhibit 2.

from these agents again regarding the indictment filed in this case.  As previously stated, Ms.

Jackson met with the agents on March 1, 2007 to turn herself in to their custody for routine

processing associated with this case.

There is no dispute that Ms. Jackson has been very remorseful, candid, forthcoming and

cooperative regarding her involvement in this case.  Not only did she immediately admit her

wrongdoing, she has complied with every request of law enforcement at every stage of this case.

Further, Ms. Jackson agreed to waive her right to file any pre-trial motions and pled guilty in a

very timely fashion thereby saving scarce judicial resources.

## II.    Characteristics of the Defendant

Ms. Jackson is a 33 year-old naturalized citizen of the United States.  She was born in the

Republic of Laos and put up for adoption.  She was adopted about a year after her birth by U.S.

citizens, Stanford and Ruth Stone.  Her adopted parents were in the military and were in their

sixties at the time they adopted Ms. Jackson.  The Stones had already had their own children,

who are approximately thirty years older than Ms. Jackson.  Therefore, Ms. Jackson was raised in

an environment similar to that of an only child despite the fact that she has three siblings.  As a

child of a military man, Ms. Jackson traveled extensively during her younger years and did not

have a stable home environment.

At the age of ten, Ms. Jackson's mother - Ruth Stone - passed away from cancer.  This

was a very traumatic experience for Ms. Jackson, in particular because she was not made aware

of how sick her mother was before she passed away.  At the precious age of ten, Ms. Jackson had

difficulty processing the grave loss of her mother and as a result had difficulty relating to her

father, who at times was more similar to a grandfather figure.  Mr. Stone was seventy years old at

the time of his wife's death.  Approximately one year after the passing of Ms. Jackson's mother,

Mr. Stone remarried.  Ms. Jackson did not share a good relationship with her step-mother,

Kathleen, which had a direct impact on her relationship with her father.  This new household was

not a happy place for Ms. Jackson and she soon began acting out.  At the age of fourteen, Ms.

Jackson ran away from home.  She was then sent to a boarding school.

At the age of fifteen, Ms. Jackson became pregnant.  On June 22, 1990, Jacqueline

Lashawn was born.  Approximately one year later, at the age of sixteen, Ms. Jackson married

Jacklyn's father Ronald Holmes.  Because Ms. Jackson was only sixteen at the time of the

marriage, she had to obtain the consent of her father in order to be married.  Her father consented

to this marriage and provided some financial assistance.  Unfortunately, Mr. Holmes was then

incarcerated and as a result they were separated which ultimately led to a divorce in February

1997.  Ms. Jackson has had no contact with Mr. Holmes since their divorce.

In March 1997, at the age of twenty four, Ms. Jackson married Terrence Lewis.  On

October 3, 1997, Ms. Jackson's second daughter - Jazmyne - was born.  Ms. Jackson was married

to Mr. Lewis for approximately one year before they separated which ultimately led to a divorce

in December 1999.  Ms. Jackson has had no contact with Mr. Lewis since their divorce.

In early 2001, Ms. Jackson met her current husband Daymond Jackson.  They married on

June 28, 2001.  The following month, in July 2001, Mr. Jackson's petitions for adoption of Ms.

Jackson's daughters - Jacqueline and Jazmyne - were finalized by the Circuit Court in Prince

George's County, Maryland.  Therefore, all parental rights of both Jacqueline and Jazmyne were

terminated by their birth fathers and Mr. Jackson has full custodial rights.  On January 8, 2004,

Mr. and Ms. Jackson's third daughter - Jayden - was born.

As evidenced by the attached letters from her husband, friends, and co-workers[3], Ms. Jackson is an extremely devoted mother. Her children are her life. Throughout her life, Ms. Jackson has done everything in her power to support and provide for her children. Further, it seems that since Mr. Jackson has come into their lives, the stability that he has been able to provide to them has had a significant positive impact. Ms. Jackson has an extremely close relationship with her three daughters and is the primary force in their lives and development.

Ms. Jackson's oldest daughter, Jackie,[4] just completed her tenth grade year at Friendly Senior High School in Ft. Washington, Maryland. This past school year has been instrumental in her development. Two years ago, Jackie attended Oxon Hill High School where her grades slipped and she found herself being bullied. After two unsuccessful years at Oxon Hill, Ms. Jackson took steps to have her transferred to Friendly High School to start anew. Since her transfer to Friendly, Jackie has truly found herself. Jackie was on the honor roll all four quarters of this past year - her grades and interest in school have rebounded. Further, Jackie has participated in the high school band's dance team, is a member of the church choir at Reid Temple Baptist, and also works part-time as a hostess at Outback Steakhouse.

Ms. Jackson's middle daughter, Jazmyne,[5] just completed her fourth grade year at Apple Grove Elementary School in Oxon Hill, Maryland. At an awards ceremony about one week ago, Jazmyne received the following awards: Honor Roll all year, Top Reader in the 4th Grade

---

[3] Please see the attached letters from her family as well as various friends and co-workers. As each of these letters indicate, Ms. Jackson's presence and support for her daughters are vital to their stability and growth.

[4] A photograph of Jackie is attached as Exhibit 4.

[5] A photograph of Jazmyne is attached as Exhibit 5.

9

(reading over 13,000 pages all year), Citizenship Award (received all A's in Social Skills and Work Habits), and the Black Sage Competition Award (Jazmyne was selected to represent Apple Grove Elementary at the Maryland State Competition held at Towson University).  During the summer, Jazmyne is involved in cheerleading and dance teams as well as activities at the American Red Cross Youth Center and the Math & Science Discovery Center.

Ms. Jackson's youngest daughter, Jayden[6], turned three this past January.  She attends daycare and/or preschool at Moonlight Enrichment Center located in Oxon Hill, Maryland.  This past March, Jayden was referred to a cardiologist for treatment of a heart murmur.  Her condition is stable and is currently being monitored.

In addition to being a devoted mother to three children with extremely busy schedules, Ms. Jackson is a committed employee.  Ms. Jackson has consistently held a variety of jobs in order to support her children.  See PSR ¶ 52-62, pages 10-11.  Currently, Ms. Jackson is employed by two different part-time employers and is hopeful to secure additional part-time employment in the coming months.

Beginning in 2005, Ms. Jackson has been employed as a part-time bartender at Pizza Italia/Frank's Sports Bar located in Oxon Hill, Maryland.  As evidenced by the attached letter[7] from the owner of Pizza Italia, Mary Privitera, Ms. Jackson is an excellent employee.  Also beginning in March 2007, Ms. Jackson obtained employment with Top Notch Tattoo Studio in Washington, D.C., as a contract employee primarily responsible for office management.  As evidenced by Mr. Walmberto Gudiel's letter, the owner of the studio, Ms. Jackson's work ethics

---

[6] A photograph of Jayden is attached as Exhibit 6.

[7] Letters from various employers and co-workers are attached as Exhibit 7.

10

are outstanding.  Further, Mr. Gudiel specifically states in his letter that Ms. Jackson has asked

him that her compensation be designated directly towards the restitution in this case, to which he

states that he will assist in this request in any way he can.  Also, Ms. Jackson has been seasonally

employed with Jackson Hewitt Tax Service in Oxon Hill, Maryland, since 2003 to assist with the

busy tax season.  As stated in the PSR, Ms. Jackson worked two nights a week from January

2007 until April 17, 2007 with Jackson Hewitt.  See PSR ¶ 55, page 11.  In sum, Ms. Jackson has

been gainfully employed since her teenage years.  She has worked very hard in finding part-time

work that can meet the scheduling needs of her daughters, while also providing financially for

them.  It has been a challenge for Ms. Jackson, but as her co-workers and employers state in their

letters, she is determined to persevere.

In light of Ms. Jackson's upbringing, including her very early family responsibilities as a

sixteen year old parent, her extreme devotion to her daughters and husband, as well as her

consistent and strong employment history clearly warrant a sentence below the applicable

guideline range.  If she is incarcerated, the impact that it would have on Ms. Jackson's family

would be catastrophic.

### III. Disparity in Sentencing

Imposing a sentence below the Guideline range would not promote an unwarranted

sentencing disparity.  Disparities arise not only from sentencing determinations by courts, but

from charging decisions made by the government and by individuals' ability or inability to

successfully cooperate with the government.  In the District of Columbia, the United States

Attorney's Office has the unilateral ability to determine whether any particular defendant should

be charged in local court or charged in federal court.  If Ms. Jackson had been charged in

Superior Court, an applicable charge to these offenses would have been First Degree Fraud

and/or First Degree Theft as currently charged in Count Twenty Three of the indictment.  See

D.C. ST § 22-3221(a).

Therefore, Ms. Jackson would have been eligible for a term of straight probation if her

case had been prosecuted in Superior Court.  However, because Ms. Jackson's applicable

guideline range is in Zone C of the Federal Sentencing Guidelines, a sentence of imprisonment or

a split sentence is applicable.  Therefore, the fact that a straight probation term is not available to

Ms. Jackson under the Guidelines in district court demonstrates an unwarranted sentencing

disparity under § 3553(a).

When considering potential disparities and the Guidelines, the Court should also consider

that in 2003, the Sentencing Commission issued a policy statement, contained in U.S.S.G.

§5K3.1, in which the Commission approved of a downward departure of up to 4 levels for

defendants who agreed to plead guilty very early on in the proceedings.  Disparities unrelated to a

defendant's offense or criminal history occur based on the disparate use of this policy statement

among United States Attorneys' Offices.  Our district does not have such a program, while others

do.

The merits of the policy statement in § 5K3.1 are readily apparent.  Early dispositions

conserve scarce prosecutorial and judicial resources.  Section 5K3.1 implements the Sentencing

Commission's desire that defendants who agree to plead early on in the proceedings receive

additional dispensation.  Here, Ms. Jackson tried to repay Pundit before any criminal proceedings

ensued, admitted her guilt at every stage in this case - including Ms. Wittstock and the

investigative agents as soon as she was confronted - and indicated her willingness to plead guilty

very early on in the proceedings.  Ms. Jackson saved scarce prosecutorial and judicial resources

by her early decision to cooperate with law enforcement and pled guilty in a timely fashion.

Therefore, if § 5K3.1 applied in the District of Columbia, it is likely that Ms. Jackson would

have received a four level reduction.  A four level reduction in the offense level here would

reduce the Guidelines range from 8 to 14 months, a guideline range in Zone C, to 0 to 6 months,

a guideline range in Zone A - thereby resulting in an opportunity to receive a term of probation.

IV.    *Sentencing Ms. Jackson to a Sentence of Incarceration would be Unduly Punitive
       and would Delay Restitution Payments*

The imposition of a sentence of imprisonment in the instant case would serve no purpose

other than punishment.  A sentence of imprisonment would prove more detrimental to her

character than rehabilitative or instructive.  Punishment is indeed one of the purposes of

sentencing, but the toll the instant case has taken on her and her family, and the fact that, in any

case, conditions will be imposed and her liberty restricted certainly serve -  in Ms. Jackson's case

- as adequate punishment.  Also, Ms. Jackson's record is now permanently stamped with a felony

conviction that will never be expunged.

Further, the Court should consider the sum of restitution in this case - approximately

$42,000.00.  If Ms. Jackson is given a term of incarceration she will be unable to provide

restitution in a timely fashion - if at all.  The need to provide restitution to the United States

government shall be considered by this Court pursuant to § 3553 (a)(7) in determining an

appropriate sentence for Ms. Jackson.

## CONCLUSION

For all of the foregoing reasons and such other reasons that may be discussed at the sentencing hearing in this matter, Ms. Jackson respectfully submits that sentencing her to a term of probation[8] is "sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, or effectively provide Ms. Jackson with needed educational or vocational training and medical care." See 18 U.S.C. § 3553(a). Further, a sentence of probation is adequate to promote the relevant sentencing objectives at issue in this case.

As the United States Attorney for the District of Columbia, Jeff Taylor, recently said to a reporter of the Washington Post about the justification in hiring, outside the normal office procedures, of a racist prosecutor, "[S]ure he's made some mistakes in judgment. For gosh sakes, everybody deserves a second chance." Clearly, Ms. Jackson has made mistakes in judgment, but she is also deserving of a second chance.

 

_____Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

---

[8] If the Court is of the belief that a straight term of probation is inadequate to meet the sentencing objectives of § 3553(a), the Court should consider sentencing Ms. Jackson to a term of home detention as a special condition of her probation.

14

# EXHIBIT 1

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE is entered into this

_____ day of March 2006 by and between Pundit Publications, Inc. ("Pundit") and Kidd

International, Inc. ("Kidd") (collectively the "Parties").

WHEREAS, Pundit is a District of Columbia corporation with its principal place of

business at _____;

WHEREAS, Kidd is a District of Columbia corporation with its principal place of

business at _____Washington, DC 200__;

WHEREAS, under the terms of this Agreement, the Parties want to ensure that certain

payments are made to Pundit on behalf of Ms. Susan Jackson, a former employee of Pundit.

NOW, THEREFORE, the Parties agree as follows:

1. **PAYMENT TO PUNDIT** As consideration for this Agreement, Kidd agrees to pay
   Pundit $40,200.00 in accordance with the following schedule: $5,000.00 is to be
   paid on execution of this Agreement; $5,000 is to be paid on March 31, April 14,
   2006, May, 1, 2006, May 15, 2006, May 31, 2006, June 15, 2006; and, a final
   payment of $5,200.00 is to be paid on June 30, 2006. Each payment is to be made
   payable to Pundit's counsel, Mark A. Smith, Law Office of Mark A. Smith, LLC,
   1785 Massachusetts Avenue, N.W., Suite 100, Washington, D.C.. Pundit agrees to
   accept the $40,200.00 as full and final settlement of all amounts allegedly due by
   Ms. Susan Jackson to Pundit.

2. **DEFAULT BY KIDD.** If Kidd fails to make any payments in accordance with the
   schedule set forth in paragraph 1, Kidd hereby agrees to the entry of judgment in
   the Superior Court of the District of Columbia, against it in favor of Pundit, in the
   amount of $40,200.00 less credits for payments of principal received by Pundit
   from them pursuant to this Agreement; provided that Ms. Jackson was under
   contract with Kidd at the time of the default and due the amounts which Kidd was
   obligated to pay under this Agreement, and provided further, that judgment may be
   confessed by a representative or counsel for Pundit, whom Kidd hereby authorizes
   as its agent to do so, provided however that such representative or counsel shall file
   an affidavit as to the amount of all credits for principal payments to which Kidd is
   entitled. In the event of default, Kidd also agrees to the entry of judgment for
   interest at a rate of twelve percent (12%) interest per annum from the date of this
   note plus attorneys' fees of 25% on the unpaid balance. Notwithstanding the
   foregoing, Pundit shall, before filing any pleadings, first give written notice of the

default to Kidd's counsel. Kidd shall have five (5) days from the date of mailing to cure any defaults.

3. **MUTUAL RELEASE.** In the event of fulfillment of the terms of this agreement, Pundit, on behalf of itself and its predecessors, successors, parents, subsidiaries, affiliates, heirs, beneficiaries, representatives, and assigns on the one hand and Kidd and Ms. Susan Jackson, on behalf of themselves, predecessors, successors, parents, subsidiaries, affiliates, heirs, beneficiaries, representatives, and assigns on the other hand, hereby release, discharge, and promise not to sue each other and/or their employees, officers, agents, lawyers, heirs, beneficiaries, predecessors, successors, assigns, and business entities on all rights, claims, lawsuits, charges, and actions, whether known or unknown, past, present, or future, which all parties may have against each other from the beginning of time through the terms of this Settlement Agreement, including with particularly any an all claims Pundit may have against Ms. Susan Jackson arising out, relating to, or referring to Ms. Susan Jackson's employment with, and conduct during and after, her employment with Pundit.

4. **NO ADMISSION OF LIABILITY.** Nothing contained in this Settlement Agreement shall be construed as an admission of liability or as an admission against interest by any of the Parties hereto.

5. **AUTHORITY.** The Parties hereby expressly represent and warrant to each other that they have entered into this Settlement Agreement voluntarily, with proper authority, and without any reservation. The Parties acknowledge that the only consideration for this Settlement Agreement is expressly set forth within this Settlement Agreement and no further inducements or representations have been exchanged in connection herewith. The Parties further hereby acknowledge that each party has had adequate time to reflect upon, consider, and consult with legal counsel concerning the terms of this Settlement Agreement. The Parties further agree that neither this Settlement Agreement nor the settlement set forth herein is the result of fraud, duress, coercion, or undue influence on the part of any party or its counsel.

6. **MUTUAL DRAFTING.** The Parties agree that: (1) each party and counsel for each party to this Settlement Agreement have reviewed and revised this Settlement Agreement and, accordingly, the normal rule of construction (to the effect that any ambiguities are to be resolved against the drafting party) will not be employed in any interpretation of this Settlement Agreement; (2) if any part, term, or provision of this Settlement Agreement shall to any extent be declared unenforceable or illegal by a court of competent jurisdiction, the remainder of this Settlement Agreement shall not be affected thereby, and each part, term, or provision of this Settlement Agreement (including, but not limited to, any enforceable and legal portion of the challenged part, term, or provision) shall be valid and enforceable to the fullest extent permitted by law; and (3) to the extent that a court of competent jurisdiction determines that one or more provisions of the Settlement Agreement are vague, ambiguous, or conflict, the Parties agree that the court should construe or

apply the provisions so that the Parties' intent is effectuated.

7. **AMENDMENT.** This Settlement Agreement may be amended or modified only by a written agreement signed by all Parties or by court authority, but any such amendment or modification shall not be deemed a waiver of any prior or subsequent breach of this Settlement Agreement unless so specified.

8. **COOPERATION.** The Parties agree to cooperate with each other in good faith in order to carry out the purposes of, and to effectuate, this Settlement Agreement, and to execute and deliver any and all additional documents necessary or appropriate to carry out and implement the provisions of this Settlement Agreement and the transactions contemplated herein.

9. **WAIVER.** The waiver of any breach of any term, covenant, or condition contained herein shall not be deemed to be a waiver of any other term, covenant, or condition or any subsequent breach of the same or any other term, covenant, or condition contained herein.

10. **HEADINGS.** The headings used in this Settlement Agreement are for convenience only and shall not limit or expand the meaning of the Settlement Agreement's provisions.

11. **COUNTERPARTS.** This Settlement Agreement may be executed in counterparts, which may be photocopies or facsimile transmissions of the original but all of which together shall constitute one and the same instrument. Photocopies of or facsimile transmissions of signatures shall be deemed original signatures and shall be fully binding upon the Parties to the same extent as original signatures.

12. **CONFIDENTIALITY.** This Settlement Agreement shall be confidential and its existence, terms or contents may not be released to any person or entity unless there is a breach under paragraph 1 above, and enforcement is sought under paragraph 2, or in response to process issued by an appropriate governmental agency or court.

13. **DISTRICT OF COLUMBIA LAW TO APPLY.** This Settlement Agreement shall be construed and enforced pursuant to the laws of the District of Columbia. By signing this agreement, both parties agree to submit to the jurisdiction of the Virginia Courts.

IN WITNESS WHEREOF, the Parties, through their respective authorized representatives, set their hands to and entered into this Settlement Agreement on the dates indicated below.

**Pundit Publications, Inc.**

By:_____

**Kidd International**

By:_____
_____

**Susan Jackson**

_____

**EXHIBIT 2**

# SANDLER, REIFF & YOUNG, P.C.

50 E Street, S.E., Suite 300
WASHINGTON, DC 20003

JOSEPH E. SANDLER
sandler@sandlerreiff.com
NEIL P. REIFF
reiff@sandlerreiff.com

COUNSEL:
JOHN HARDIN YOUNG
young@sandlerreiff.com

TELEPHONE:  (202) 479-1111
FACSIMILE:  (202) 479-1115

May 1, 2007

The Honorable Richard W. Roberts
United States District Judge
United States Court House
333 Constitution Ave., N.W.
Washington, D.C. 20001

Re: Susan L. Jackson

Dear Judge Roberts:

This letter is written to respectfully request that the Court consider a lenient sentence with respect to Mrs. Susan L. Jackson. In particular, I urge the Court consider alternative sentences which do not include incarceration.

Ms. Jackson sought the services of this firm in attempting to work through the repayment of amounts owed to Pundit Production, Inc. (Pundit) in early 2006. Ms. Jackson acknowledged to our firm and to Ms Whitlock of Pundit her mistake. She was earnest in trying to find a way to repay Pundit. We explored with her the availability of any family funds, retirement funds and the like. None exited. Mrs. Jackson held several jobs on top of her jobs as a mother to several young children. We also attempted to work with counsel for Pundit to have a full assignment of the wages made to Pundit from a potential job with a moving company. Counsel Pundit requested guarantees from the moving company as to full payment regardless of whether Mrs. Jackson was employed by them. The moving company decided not to provide the guarantee and not to hire Mrs. Jackson.

We believe Mrs. Jackson to be sincere in her remorse and her desire to repay the amounts to Pundit.

Judge Roberts
Page 2


We believe that she remains a valuable asset to her family and to society. We hope she will be given opportunity to repay Pundit and prove to be a model citizen.

If you have any questions, please let us know.


Very truly yours,

John Hardin Young.

**EXHIBIT 3**

June 20, 2007

Dear Judge Roberts:

My name is Daymond Tyrone Jackson the husband of Susan Jackson. I want to express to the court **desperately** how this situation has affected our lives.

I was in mere shock and disbelief when this was brought to my attention. I have never had such a whirlwind of emotions in my life. But I stand by my wife and am willing to do anything to help make this better, not only for her, but our family.

We will be married 6 years this June 28th. Words cannot express how she has changed my life and made me a better person and father. I adopted her two girls from a previous marriage when we married and I love them as my own. Then a few years later we had an addition to our family, another girl. We went through trying times with a high risk pregnancy and months of bed rest on her part, but as she says, it was well worth it.

We have struggled, from check to check, and I admit our marriage was going through a lot of financial stress. I never knew how serious things were. Never in a million years would I have thought she would do what she did, over a period of time, to try and keep our family together. I have never stolen anything in my life, and true, if I would have known of this before, I would have left. I only wish she would have communicated with me so we could have avoided this. As a man, I must admit that my ego was crushed beyond repair and forgiveness, so I thought. I feel that I could not provide a good home and adequate income to live day to day; which is why she thought she had to go this extreme; to keep up our way of living. I had to find forgiveness in her actions and try to understand why. I also, know now she understands that it's not just about our finances. That we will make due and provide for our children the best way we can. We are presently seeking counseling through my employer to strengthen our bonds of trust and communication.

I am also presently seeking further employment to add more income in our household to assist her in paying restitution. She's hardheaded and is working several jobs in preparation to start paying restitution. I tell her we are in this together now, and I'd rather work until I can't stand anymore so she won't have too and she can spend more time in rearing our three girls. She still thinks she's in this alone, I only hope she realizes I am not going anywhere and I am standing by her side. They need their mother more

than me, at home, to keep up with their daily routines. She's excellent at that; school functions, homework, play dates, etc. If it was me, it would be frozen dinners every night, sad to say.

I also understand clearly, how she doesn't want to be alone. How she has felt that all her life people have left her. Being put up for adoption as an infant, she felt unwanted, not loved. The passing of her adopted parents early in adolescence. She married at 16 when life is supposed to be just beginning for many; twice to men who fathered children but left her the full responsibilities of raising them. When we met, I was 24 years young, no children and never been married. Everyone thought I was insane to take on the responsibilities of a wife and raising two girls with no experience. But Susan had that effect on me and impact in my life. We married early in our relationship but the love I have for her has not gone anywhere, in fact, it grows stronger everyday. She makes me complete.

I cannot speak for Susan, but I know she feels as if this was a bad dream she cannot wake up from. She was very close to Melinda and feels her betrayal will weigh her down for the rest of her life. I know she wants to do everything and anything to make things right. She is working several jobs and still being a full time mother to three very busy girls.

I have seen her change since this has happened. She is more appreciative and devoted to everything she's doing. I don't know what I'd do without her. I know I couldn't do any of this without her and I never thought I would be in a situation to even have to think about it. She holds our family together, I need her and our children need her and I only hope that you can recognize how sincere she really is and wants to make this right.

This letter was hard for me to write because I am not a man of many words. It could have been a novel, given enough time, but there are not enough words and paper to tell you the impact and remorse we all feel now as a family.

I would recommend probation with restitution. My wife doesn't have a criminal history and has always been an active positive member in our community. I know she is trying to turn this situation around and make it better for herself and our family.

Respectfully,

Daymond T. Jackson

June 1, 2007

Dear Judge Roberts,

My name is Velina Brown and I am the paternal grandmother of Jazmyne, Susan's 9 year old daughter. Susan was once married to my son, Terrence for a little under two years. Unfortunately, things did not work out ending in divorce and my son giving up his parental rights. Not to say the least, I was disappointed in my son's actions, but still to this day consider Susan my daughter-in-law. What a strong young woman. Daymond, her current husband I absolutely adore. He stepped up to the plate and took on the responsibilities of Jazmyne and Jacqueline with no hesitation, and then came Jayden. I love both of them dearly.

I have been on disability for many years and I rely on Susan to take me to my doctor's appointments, pick up my medication and care for my adolescent son when I am to sick to care for myself. She also administers my meds and bathes me when needed. She runs my errands, making sure all my bills are being paid when I receive my disability, does my grocery shopping and sits with me when she finds time in her busy schedule.

She and I talk about everything. I know all about the troubles she has been going through trying to keep her family together and the unthinkable actions she displayed at her former place of business. I know that Susan is beyond remorse and wishes she could turn back the hands of time, but unfortunately that is not an option. I know that she is working several jobs in anticipation to start paying restitution. Your Honor, aside from her children and husband needing her, I need her. I know given the opportunity Susan will not let the court down, not now, not ever again. Please consider a lineate sentence. I hope and pray for recommended probation with restitution.

Sincerely,
Velina Brown

April 19, 2007


Dear Judge Roberts:

My name is Marcus Mudarri and I have known Susan for over 10 years. She is the Godmother of my son, as well as, a part of my extended family.

Over the years I have watched her grow as a friend, community member, and wonderful mother. She has struggled most of her life; dealing with the death of her mother before the age of 13 and her father soon followed; having to raise her first child at the tender age of 16 and married. My parents are divorced and both remarried. They consider Susan as the daughter they never had. Our families are very close, through all the laughter and the tears.

On another note, I also own a catering business and have called upon Susan to assist me with many functions. Susan makes sure I keep all my financial records in line and I have never had any problems with her work performance. Even though we are very close friends, she keeps business, business.

I admire her perseverance and passion to make amends with her former employer, given a second chance. Her heart and mind is in the right place and she is focused and determined. I would recommend probation with restitution.

Sincerely,

Marcus Mudarri

Honorable Richard W. Roberts
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001


Your Honor,

    I have known Susan Jackson for almost fifteen years and I can say with absolute
certainty, that she is one of the dearest friends I could have ever hoped for. Since we first
met in 1993, she has proven herself to be a wonderful, caring and generous woman. But
above all else, she is a devoted mother.

    In all honesty, when Susan and I first met, I instantly fell in love with her. She had
one of the brightest smiles and kindest natures I had ever known. But what sealed the
deal was her love and dedication to her first born, Jacqueline. Over the next three years,
my friendship with Susan grew, as did my affection for her until we eventually became
engaged late in 1996. Unfortunately that was the year my father was diagnosed with
cancer. I left DC and returned to Los Angeles to be with my family. At the time, Susan
was adamant about not taking Jacqueline out of school so we decided that I would go first
and they would follow me. This is when I learned what a beautiful person Susan really
was. She called to check on my father and me every day, constantly being supportive and
caring. I sent for her and Jacqueline to California to spend Thanksgiving with my family.
However, as my father's condition deteriorated I began to pull away, until finally I broke
off the engagement. When Susan, learned about my father's death a few months later,
she was the first person to call and be the supportive friend I needed, despite my running
out on our engagement. She was able to put the past behind us and focus on a friend who
was in need and I don't know if I will ever be able to repay her for that type of
unconditional love.

    With our engagement over and my determination to stay in Los Angeles, our
relationship began to turn into one of the deepest and most fulfilling friendships I've ever
known. We continued to make each other a priority in the others life, talking for hours
on the phone when the other just needed an ear to listen. As the years went by and our
friendship continued to deepen she eventually found a man who was strong enough to
stay by her side and create a family with her. Susan's three daughters are her life. I
know this because of how active she is in there school work and school functions, often
volunteering her time to help out at school. She takes a very active role in her daughters'
lives and is never too busy for them. Even while working two jobs to make ends meet, I
know there was never a time when her daughters felt neglected or unloved.

    Aside from the love she has for her children, one of Susan's biggest assets is her
dedication. Not just to her family but, to whatever task she undertakes. I have seen first
hand her dedication to her job as well as other projects she might take on. I have seen her
put her all into Event Promotions and while she was directly involved with some of those

events, most she was not.  Still, she put her all into it, because once Susan takes on a project, she doesn't leave it until it's done.  She is a woman who will see things through to the end and never stop fighting.  That may be one of the things I admire most about her, a quality that I myself have sometimes lacked.  If our roles had been reversed years ago, I know she would not have run out on me as I did to her.  That's just the type of woman she is.

I have been made aware of the offense, which Susan has been accused of and I can say with absolute certainty that it is something that she would never be accused of again.  I have spent hours on the phone with Susan as we often do and I know that she would never again, willingly do something that could jeopardize her relationship with her daughters.  I know that what she wants most is to be with her daughters and see them grow into young women that will one day surpass her own achievements.  Isn't that the goal of every dedicated and loving parent?  In my time, I have learned that it is and I can say with one hundred percent honesty that Susan is one of the most dedicated and certainly one of the most loving parents I've ever met.

Susan is my friend; my heart and I love everything about her. But I am only this way because of the beautiful spirit that she is.


Sincerely,
Jonathan Butler
Writer/Director/Producer

April 19, 2007


Dear Judge Roberts:


In the three years I have known Susan Jackson I have been impressed with her dedication to any endeavor she has been involved with. She is an extremely hard work, very ambitious, forward thinking and has been an enormous asset to any project that she has been involved with.

Many times she has been consulted upon to assist me and my organization with various functions. Susan's foresight and dedication have ensured that our functions were outstanding and I attribute a great deal of that success to Susan. I feel her attributes demonstrate someone with great character.

Even though our relationship started as a professional one, our families have grown to become very close. I have watched her interact with her children in such a graceful and patient manner. She has "mommy" written all over her.

I understand she has pleaded guilty to a felony, and although in normal circumstances my organization would dismiss her contract work, we know what a tremendous asset to us she really is and that we would be the ones with the loss. She has explained in great detail the events that has lead her to where she stands now and shows great remorse. I can only hope that you see her sincerity and eagerness to make amends.

I look forward to her continuous work with my organization and recommend probation with restitution.

Sincerely,
Matt Brown, IV

April 18, 2007

Dear Judge Roberts,

I have had the pleasure of knowing Susan for over 5 years now.  During the years of our acquaintance, I have known Susan in many capacities.  She is a great mother of three wonderful children for who I have assist her in watching when both her and her husband worked late hours on many occasions.  I have two children of my own and they all interact so well together, very respectful, something that you don't see now a days.  Her responsibilities as a mother range from raising a toddler to a teenager, as well as, being a devoted wife.  She is a hard working dependable employee and active participant in her community which I have had the pleasure to accompany her family on many outings.

Susan is an intelligent, capable, dedicated and personable young woman.  She is always quick on her feet, with sensible reactions in all the circumstances I have seen her in.  I am confident in saying that she is capable of handling any situation with thoughtfulness and maturity.

I understand she is facing a life changing decision, and we are all praying for her.  I can only hope that you can see that she is truly regretful and is anxious to get back to her life.  I don't need to know the severity of the crime she admitted to, but just to know she has admitted her faults and is ready to make amends.  My recommendation would be probation with restitution.

Sincerely,

Sophia Hollis



NATIONAL
CENTER FOR
**MISSING &**
**EXPLOITED**
C H I L D R E N˚
www.missingkids.com

Friday, April 20, 2007

Dear Judge Roberts:

I have known Susan Jackson for the past six years. I can honestly say that she is a woman of dedication and determination. Susan and I have daughters that attend the same school in fourth grade and have been friends with one another since they were in Pre-K.

Susan demonstrates a giving and generous nature all the time and she has been an excellent role model in her children's lives and also my daughter. She demonstrates extreme patience and her corrections come with explanations the help them understand why it was necessary to what she was asking of them. She has a huge heart for anyone and she makes you feel welcome at all times, regardless of whether or not her day is going well. She is one of my points of contact for the school, for this I trust her.

Over the years we have become close friends. Many talks, much support and tears have been shed between our families. Through it all she has always been so strong. I often wonder how she maintains with such graceful composer.

Although I am aware of the incident that has leaded her into the court, it has not changed my feelings towards her. I know that circumstances have placed her life where she is facing many trials and tribulations, but I have faith in Susan and her upcoming choices. I do believe with sincerity that she is remorseful. We all make mistakes, some greater than many, but it's those who have a conscious, that want to change, to make amends. I know through life we all have burned some bridges, and if I had a second chance to make amends, I still would.

I feel these attributes demonstrate someone with an exceptional character.

Sincerely yours,

Sherelle A. D. Mitchell
National Center for Missing & Exploited Children
699 Prince Street
Alexandria, VA 22314
(703) 837-6254 Office
(703) 549-4504 Fax
smitchell@ncmec.org

May 21, 2007


Dear Judge Roberts:


My name is Malika Shampine and I am coming to you with nothing but remorse, hope, and prayers for Susan. The Jackson family has become a permanent fixture in our lives, community, hearts and minds.

I have known Susan Jackson for over 6 years, whom I interact with socially in and out of the workplace. I can confirm that she is a woman of great integrity. She is extremely dedicated to her husband, Daymond and three girls, Jacqueline, Jazmyne and Jayden. Her family loves her immensely. She is a peace loving individual whom at all times I have found to be dependable, reliable, hard-working and honest.

Susan came to me and asked I write a letter to you, Your Honor, on her behalf and there was no hesitation on my part. She has expressed to me the impact in her home this crime has caused and the regret she feels. Shame, is a minor word to what she is feeling. We all make mistakes, some greater than others, but my assessment of her has not changed. Only that I have more respect for her as she faces her demons. She is still a great mother and wife and one of the most sincere, in your face people I have had the pleasure of knowing. It takes a lot to first admit and then deal with the criticism of others, but she knows what she did was unacceptable and against the law. There is never a tolerable excuse for any crime but sometimes there has to be a sense of understanding. I can say, I understand. I still disagree with her actions but I understand. So please, Your Honor, when making your final decision know that Susan is not a common criminal and I know she would not be a repeat offender of any sort. She is a tax paying, law bidding citizen that made some bad decisions and is truly feeling rueful. I would recommend probation with restitution.

Yours Faithfully,

Malika Shampine

May 23, 2007

Dear Judge Roberts,

I am writing this personal letter of character on behalf of Susan Jackson, whom I have known for over five years.

During the years I have known Susan I have always found her to be friendly, engaging and thoughtful of others around her. One example of her thoughtfulness and generosity was last Christmas. She organized free meals at her place of employment for families who would not have had that great Christmas dinner we all love so much. She also had her patrons donate to a money tree to purchase gifts for the little ones in her local community. Whether it was a dollar or .25 cents, she made sure every child left that night with a gift. It was a king token of friendship, which shows how attentive she is to others' needs and happiness.

Susan is an intense and conscientious worker, but when the day is done, it is clear that her first priority is her family. Susan always speaks at great length about her family and it is obvious they have a close bond with each other.

Indeed, Susan has learned a valuable lesson, if nothing else, by virtue of the idea of being separated from her family.

I believe Susan to be an excellent mother, spouse, friend and community member. Susan is hardworking, responsible and dependable. She is kind in heart but is also determined to succeed in life and to keep her family intact.

Respectfully,

Lonnell Bond

April 17, 2007

Dear Judge Roberts:

This letter is in reference to Susan Jackson concerning a character profile on her. My name is Catherine Adamo and I have had the pleasure of knowing Susan for over five years. When asked to write this profile, the first thing I did was smile, because that is the effect she has on me.

Susan and I have been co-workers for ever two years. In my experience, the best way to get to know an individuals character is to work with them. Susan has been, and still is, a joy to work with because she not only diligently tends to her own given responsibilities, but also can be counted on to pick up the clack for others who need to be absent.

During the time that Susan and I have known each other; our relationship has grown into a wonderful friendship. I have gained an enormous amount of respect for her in the way that she raises her three girls, for the devotion to her husband, her dedication to her job(s) and her loyalty and heartfelt ways in her friendship. As I mentioned before, when I hear the words, "Susan Jackson" all I can do is smile.

Your honor, Susan and I have talked on several occasions regarding her upcoming court appearance. I can only imagine the butterflies she is feeling. I think at times, I am more nervous then she is, because she is the type of person to not worry another. I know she shows great remorse and admittance in her life error and only wants to have a second chance to do the right thing. To continue to in steal positive values in her children; to continue to be a successful consultant and employee; a devoted wife and sincere friend to many. Please have compassion in your decision. She is a huge asset in the workplace and in our community.

My recommendation would be probation with payment of restitution.

Sincerely,

Catherine Adamo

**To:**   Honorable Richard W. Roberts
United States District Judge
333 Constitution Ave., N.W.
Washington D.C. 20001

**From:**   Stephen M. Tevault, Jr.
148 Lakeview Dr
Colonial Beach, VA 22443

**Ref:**   Susan L. Jackson

---

Dear Judge Roberts,

Your Honor, I would like to inform you of the friendship I have developed with Susan L. Jackson and her family for the past 4 years. She has made a great impact on the term "friends" throughout our relationship. She has always been there for me for any emotional support ever needed on my behalf. I also know she is a loving wife to her husband (Daymond Jackson) and a fabulous mother to her children (Jacqueline, Jazmyne & Jayden).

I was advised by her of the Wire Fraud charge and her guilty plea that was entered on her behalf. I can only hope that you too can see her integrity and character, standing before you and awaiting your final decision. *James Baldwin* wrote "You cannot fix what you will not face"; I feel she is doing just that. Susan is a polite, sincere, positive and most importantly a caring person. I believe she will contribute to her family and her community with the help of your positive decision.

I confide in your decision and hope that you decide to be lenient with determining an appropriate sentence for these matters. If there is of any reasons for me to be contacted, please do not hesitate to do so.

Sincerely,

*Stephen M. Tevault, Jr.*

Dear Judge Roberts,

I have had the pleasure of knowing Susan L. Jackson for about 10 years. During the years of our acquaintance, I have known Susan in many capacities. She has been my co-worker and for many years now, a friend. Susan is an intelligent, personable, dependable, reliable, hard-working, and dedicated mother who always puts her children first. She is careful to make sound and sensible decisions. Susan always says how her children mean everything in her life to her. She always helps others when assistance is needed. Her character is one that is passionate and humorous. I feel confident in saying that she is capable of handling any situation with thoughtfulness and maturity.

I know that whatever the case may be, she is trying to make things right. I know she has well learned a valuable lesson in the antics she has displayed with her previous behavior and given the chance, she is already setting a good example forward. She is a well respected member of the community. I know that she is working several jobs to maintain her household. I truly do not see her repeating any of this behavior in the future. I know her only goals are her children, her marriage and her career. I know in conversations that she is sincere and remorseful with her previous employer and wants to pay restitution. My recommendation would be probation with payment of restitution.

Carmen Hines

240-505-1719

Honorable Richard W. Roberts
Unites States District Judge
333 Constitution Avenue, N.W.
Washington, DC 2001


Dear Judge Roberts,

I felt quite honored when Susan Jackson asked me to write a reference letter for her.

In addition to raising a family, being a good wife, and friend, Susan has always found time to get involved in life around her. Unlike many people these days, whenever she adopts a cause or pursues a new interest she is guaranteed to be highly committed.

I've known Susan over eight years. During that time I have always been amazed at her level of enthusiasm. Susan's been a huge influence in my life and many others. Susan has been a special friend to me I value our friendship to the fullest. Susan is also a problem solver. I could always talk to her about anything, and she would never look at you different no matter what the situation were.

Much thought goes into the things Susan does, and she has an unusual ability to notice what others overlook. Susan and I use to work together I use to love going to work to see Susan she always made the work place fun. There were days when I would be down and Susan would lift me up.

I could continue with descriptions of Susan's many other good qualities- her work ethic, her energy, and her creativeness to name three. Instead I would simply like to say how much I think of Susan and how strongly I recommend her for any task that requires problem solving and a high level of commitment.

I would recommend probation with payment of restitution. Susan does not have any criminal history and I do believe in my heart these actions would not be repeated.

Sincerely,


Lola Stevens
Sales & Audit Training Coordinator
BNA, Inc.
1250 23rd Street, N.W.
Washington, DC 20037
Direct: 202-530-1726
lstevens@bna.com

April 19, 2007

Dear Judge Roberts:

My name is Maynard Smith, and I have known Susan Jackson over 5 years both professional and personal. Over the years, my fraternity has contracted Susan for several functions that have always been successful. I have grown to respect and admire her work ethics, as well as, her family values. I have witnessed on several occasions her strive to better herself in her work and as a wife and mother. She has always exemplified her place in the community and is well like by many.

Susan is trustworthy and dedicated to what ever she sets her mind to and I am glad to say I know her acquaintance.

Regardless of the current circumstances, I believe that she will put forth with extreme effort in restoring her dignaty and make amends as directed by Your Honor. I don't see her repeating any kind of criminal acts in the future, but turning this situation into something to learn from. My recommendation would probation.

Sincerely,

Maynard Smith
240-988-8290

April 27, 2007

Honorable Richard W. Roberts

United States District Judge

333 Constitution Avenue, N.W.

Washington, D.C. 20001

Dear Honorable Richard W. Roberts,

My name is Trez Kilpatrick, I live in Charlotte, North Carolina and I have known the Jackson family for about eleven years. I met Susan through her husband many years ago in college at Georgetown University. After college we would converse weekly either through electronic mail or by telephone. Also once a year my family would meet their family for vacation. The time our families spent together was very enjoyable. Susan is the cornerstone, heartbeat and backbone of her family. She is one of the most truthful and straight forward people I know. The changes I have witnessed in others' lives have really shown me what an inspiration she can be towards others.

We all make mistakes and I know that Susan is very remorseful with the decisions she made to lead her on this path but I do know that her heart is in the right place. I know she would never want to put her family through the pain and embarrassment of this or

any situation ever again. I know she's struggled since a teen and all she wants is to provide for her children and see that they do not follow in her footsteps with any irrational decisions that life will put in front of them.

I know her plans are to continue to be a hard worker, a member of the community and law biding citizen. To continue to strengthen her marriage and be the best mother she's capable to be. My recommendation to Your Honor would be probation.

Sincerely,

Trez Juan Kilpatrick

Dear Judge Roberts,

By way of introduction my name is Douglas L Miller. I am the General Manager & Director of Government and Global markets for InterCall, a collaboration service provider headquartered in Chicago IL. My offices are based here in Arlington VA.

I'm writing this letter to speak to the character of Susan Jackson. I've known Susan and her husband for about five years. Through five years of friendship I've known Susan to be an extremely hard worker and good friend who is intensely loyal to her husband and a committed mother to her children.

My wife and I spend time with Susan and her family virtually every weekend at various functions such cookouts, family gatherings and church functions. I've found Susan to be a reliable friend whom I've counted on during difficult times on numerous occasions but her most defining characteristic is she is an outstanding mother to her children. Susan is not only a loving mother but one who works hard to provide for her family and to set standards for her children. She leads by example with a strong work ethic and teaches her children accountability balanced with a loving and nurturing quality that has helped her raise three wonderful kids.

I've come to know Susan as a wonderful wife and mother who is working hard to raise a family with strong values and moral fiber. She is also a great friend to my family and me.

While have only a vague understanding of the crime for which Susan is facing punishment I do know that she has true remorse in heart and conscience. Susan is an intelligent and responsible woman who has learned a great deal from her mistake and will not repeat it. I know that Susan is and will continue to be a provider and caregiver to her family and productive tax paying member of society.


Sincerely,


Douglas L Miller
General Manager
InterCall
1005 N Glebe Rd
Arlington, VA. 22201
(O) 703-528-7439
(C) 703-589-4484

May18, 2007

Dear Judge Roberts,

My name is Aaron Manarin and I have had the pleasure of knowing Susan over 6 years. Her husband and I grew up together in Alexandria, Virginia.

Susan has been a mother for over 16 years and as a single father to a young daughter there has been many times that I needed a motherly figure present. I value her opinion and parenting with the up most. There was a time a few years ago, with no hesitation; she opened the doors of her home to us. Never expecting anything but giving me an opportunity to get back on my feet after a company lay off. I am forever grateful so when she came to me asking for this letter, there was certainly no hesitation.

I am not a man of many words, especially writing but I wanted to express to the court what a wonderful woman she really is. She has been a positive turn in her husband's life as well as my own. A woman of many tasks I've always said. Her sensitivity and friendship has made me more aware of the world around. She has been a great addition to my family and the care she provides for my daughter can not be replaced. It's been such a personal struggle as a single father but knowing Susan has made my journey pleasant.

I can only urge the court to be lineate. I know from countless talks that Susan is eager to move forward and make the best out of this irresponsible act. I would recommend probation. I do believe that this behavior and poor judgment would not continue and she is truly remorseful.

Sincerely,

Aaron Manarin

*FROM THE DESK OF CARTER FLEMMING*

April 20, 2007

Dear Judge Roberts,

I have known Susan Jackson over the last six years. She is married to a man, Daymond Jackson, who grew up as part of our family during his teenage years. We have been a part of their lives since they got married and had their daughter, Jayden. They have been to our home on numerous occasions at holidays and other times.

Susan has always been a devoted mother to her three daughters. She is a tireless hard worker trying to provide income for her family so her children can enjoy a good standard of living. Her children are well behaved and have been brought up well from my observations.

It has been a pleasure to get to know Susan over the last six years and watch a new family form as Daymond adopted her two older daughters before they had their own daughter. Both Daymond and Susan are hard workers in their respective jobs so their children can have a secure life.

Sincerely,

Carter D. Flemming

Lt. William Waithe
511 Harry S. Truman Drive
Largo, Maryland 20774

May 26, 2007

Honorable Richard W. Roberts
United States District Judge
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Roberts,

I have known Mrs. Susan Jackson and her family for many years. Mrs. Jackson is a hard worker making and maintaining a life for her children, along with Mrs. Jackson. The years of knowing Mrs. Jackson she has always helped others whether it is advice or emotional support. While working at one of her many jobs, she takes on shifts that other workers cannot and will not take on. Because of her strong character that she possesses, the customers respect her. Mrs. Jackson, when not at work, she spends the time raising her children. I have seen the children with her many of days in the community on her off days. Many officers, like me, know Mrs. Jackson and her family in the community, as well as, from her place of business. Many officers, on and off duty, consort at Mrs. Jackson's place of business where we all have worked with her on several occasions (consulting) and respect her authority and business mind.

Judge Roberts as you know, "to human is error." If anyone in my lifetime of forty-nine years of age needs a second chance, please let it be Mrs. Jackson. Her heart and soul is good and kind. We all pay for what we have done through time. I believe what she has done and/or been charged with, her mind, soul, consciences has punished her at the same time raising kids!

Judge, as a Police Officer for over two decades, I truly believe Mrs. Jackson would not ever think of doing any type of crime in her lifetime after going through this. I have an entire Forest Heights Police Department behind her and in closing Judge Roberts, please consider an appropriate sentence for Mrs. Jackson.

Respectfully,

Lieutenant William Waithe
Forest Heights Police #9400

Jackie - 16 years old



Jazmyne - 9 years old



Jayden - 3 years old



**EXHIBIT 7**

Pizza Italia / Frank's Sports Bar
6308 Livingston Road
Oxon Hill, Maryland  20745


March 16, 2007


Dear Judge Roberts:

The contents of this letter are to confirm Susan Jackson's work schedule at Pizza Italia / Frank's Sports Bar located in Oxon Hill, Maryland.  Susan has been employed since 2005 as a Bartender.

Her normal work day begins at 6 PM.  During the week nights we close at 2 AM and on weekends we close at 3 AM.  Susan has on many occasions come in before 6 PM to relieve the daytime staff.  She also sometimes covers the morning/afternoon shift (10:30 – opening @ 11am until 6-7PM) and ALL day shift on Sundays (2:30 pm – opening @ 3PM until midnight).  During a shortage in staff, she also has waited tables.  After closing it normally takes about an hour to clean up and close out.

As an employer, I have, in a sense, adopted her into our close knit family.  We all are very fond of her and her family.  We have spoken intimately on several occasions and she has been very honest and upfront with this current situation, which I know was difficult but I admire.  I can only imagine how hard this is for her but I know that she has this passion to make things better.

Incarceration would only hinder her from her family and work.  I know she holds several jobs, as well as, consulting because she is eager to start paying restitution.  I have added to that with extra shifts to her schedule, as requested.

I clearly believe she will continue to be an excellent employee, mother, wife and friend.  My recommendation is probation.

If you have any questions please feel free to call.


Best Regards,
Mary Privitera
Owner
(301) 839-3446

# *Top Notch Tattoo Studio*

April 23, 2007

To Whom It May Concern:

My name is Walmberto Gudiel, owner and operator of Top Notch Tattoo Studio. I have had the pleasure of knowing Susan well over 9 years. She has been a part of my extended family as far back as I can remember. She has helped and stood by me during the roughest periods in my life. So when she came too me looking for some contract work I could not resist. I needed the assistance anyway. She expressed the need to find another source of income so she could direct these funds towards paying her restitution in its entirety.

Susan has been a contract employee since mid 2007. Her hours vary because a tattoo shop is not a normal 9 to 5 business. Her role is Office Manager. Handling all the day-to-day duties, such as, marketing, telephone inquires, ordering and maintaining supplies, accounting, conventions, running errands, etc. The work required is often in the field and sometimes can be extra long hours. Her pay is by day, not to exceed over $100.00 (U.S. Dollars) and she is required to work a minimum of 4 days. We are open 7 days a week with appointments ONLY on Sunday. She has spoke to me about designating her pay towards her restitution directly, which I have no problem assisting her with.

Her work ethics are excellent and she is very dedicated. She has been able to separate business from personal, which I value and respect very much. The customers enjoy her spark she adds to the office, as well as, the rest of the staff.

On a personal note, she has always displayed her dedication to her family. Her children and husband are always first. At first I was taken by the incident that has occurred, but knowing Susan and sensing how her back was against the wall, I was just as remorseful as she. I know her decisions were not the smartest she has ever made, but I do know her devotion to making amends. I know she is sincere, and given the chance to make a bad situation better she will not make another error. She's never even gotten a traffic ticket and I know this is not the role model she wants for her children.

My recommendation is probation with payment of restitution.

Sincerely,


Walmberto Gudiel
(301) 529-7322

May 21, 2007


Dear Judge Roberts:

I am writing to you in regards to Susan Jackson. Susan and I have worked together seasonally at Jackson Hewitt for over 4 years now and every year I look forward to her presence. Outside of work our families have become very close. Our children participate in play dates and we alternate with other working mothers to give one another a break to run errands, etc. Her children are very well mannered and respectful. This is purely a reflection of her own self values. We have all participated in community outings, flea markets and fundraisers that have all been very successful. She brings organization and a passion that passes onto others around her.

I know that Susan is a hard worker and devoted mother. I can understand that she is the type of person that doesn't like to ask others for assistance. Normally, she is always the giver. The type of person that would give you her last dollar or rather you eat then her. So given the circumstances I can see why she may have felt that her back was against the wall. I know in conversations we have had since this offense first occurred that she is very remorseful. Unfortunately, life doesn't let us go back and redo what mistakes we've made, but I know if given the opportunity, she will make amends. Susan has the type of personality that touches everyone she comes across. Always uplifting, even when others in her shoes may feel there is no way out.

She has always struggled since the passing of her mother before she turned 13. Then felt abandoned by her father after he remarried. Her comfort and sense of security only came when she wed at 16 and was already a mother. And what 16 year old knows comfort and security so young? Now, she raises her three girls not to follow in her path. She doesn't want to see them struggle as she did. She invests the old fashion values that lack a lot of families in this generation. I can go on and on writing and I am not sure how personal to get in this letter, so therefore, in closing I ask Your Honor the consideration of probation.

Respectfully,
Tanisha Gibbs

May 21, 2007


Dear Judge Roberts:

First let me introduce myself, my name is Melanie Casas. I have had the pleasure of knowing Susan and her family for over a decade now. We currently work together part time but our friendship has been one of the most positive things in my life.

I admire her as I have watch over the years her raise three girls, work multiple jobs at a time and be a devoted wife. I can truly say she is the backbone to her family. I don't know how she does it and stays so together. I only have a dog and my day is full.

I know I can always count on her in my time of need no matter what. It can be the middle of the night and she always lends an open ear. About a year ago, my fiancé passed away in a motorcycle accident and I felt my world had ended. Susan was there every step of the way with her kind hearted words and shoulder to cry on. She taught me to take my pain and turn it into loving memories. Something that I was not familiar with because I never had anyone close to me pass away. She explained to me how she felt as a child when her mother passed and how she dealt with the passing of her father a few years later. All this lose before she turned 20. I admire her strength and perseverance. I couldn't even begin to imagine how her life was during those times but I can say whatever obstacles she jumped it has made her one of the most sincere people I know to this day.

She had confined in me about the ongoing court case in great detail and I must say her sincerity and desire to make things right are beyond words. I can only ask that the court is lineate in her sentencing and I would pray for probation with payment of restitution.


Sincerely,

Melanie Casas

June 6, 2007

Dear Judge Roberts:

My name is Shanay Gibbs and Susan and I have worked together at Jackson Hewitt Tax Services seasonally for over 4 years. Outside of work, she has become very close with my family, as I am with hers. Both of us our active mothers and we engage our children in several activities together throughout the year.

Susan has this "take charge" attitude. When others are hesitant, she's right there in your corner with positive feedback.

Over the years I have grown to respect and admire her, both professionally and personally. Ultimately, I trust her judgment and no matter what misguided decisions she made in the past, I truly believe she will overcome. I don't see her repeating any of this behavior in the future at all. She has shown a great sense of disbelief and sorrow and only wants to make things right. My recommendation would be probation with restitution.

I look forward to continuing to build this relationship that we have established as friends and colleagues for many years ahead.

Sincerely,
Shanay Gibbs

May 17· 2007


Dear Judge Roberts:


I have known Susan for a little over a year after moving to Maryland from the Midwest and she has truly made my life happier. Coming out here, not knowing anyone and having no family in the area really made times rough for me. But working with Susan almost on a daily basis has always been uplifting. She can read me and knows exactly what to say and do to make me feel better. She is a true friend and very loyal.

My 5 year old son has come here to visit for the summer and Susan has made this adjustment more feasible for me and my work schedule. She and her husband, Daymond have volunteered to care for my son when not working so I can make ends meet. I plan to return home at the end of the year and will miss Susan greatly, but will never forget that there are sincere people in this crazy world. I am pleased to say she has touch both mine and my son's lives and we will forever be appreciative.

I know about the crime she has pleaded guilty too and I asked if given a second chance, what she would do. Her response first was to pay her restitution to her former employer. She expressed at one time they were very close and the betrayal she displayed was not a part of her personality. I know her sincerity is real and only hope the court will find lenience during her sentencing phase. She is a great asset here, at work, and in all our lives. My recommendation is probation with restitution.

Sincerely,

Michelle Sabato